Clifford Young, the question in this case is whether the district court erred in applying section 3c 1.2 of the sentencing guidelines which calls for an increased sentence where the defendant created a substantial risk of death or serious bodily injury while fleeing from the offense. Now, in the ordinary case, when this guideline applies, it's because the defendant led police on a high-speed chase through traffic and recklessly endangered the motoring public while fleeing. That didn't happen here. Instead, the government's primary argument is that the guidelines should apply because the defendant verbally threatened to shoot himself and to shoot the police while fleeing from the offense. Now, obviously, threatening to shoot... He also went over a spike strap, could have had a blowout, could have gone off the side of the road, could have killed ten people. He went over a spike strip, however, the definition... He went over it carefully, is that what you're saying? No, the definition of reckless endangerment requires that the defendant be aware of the risk. And there was no evidence, the district court made no findings that the defendant was aware that the police had deployed spike strips. And there's persuasive decisions from the Fifth and the Ninth Circuit that says you can't assume that the defendant is aware of police tactics to capture him when he's in the midst of an instinctive flight. So, that... So as long as he goes below the speed limit, there's just no problem, he can go forever? 50 miles, 100 miles. Yes, this court's cases say that merely fleeing from police is not enough to satisfy the reckless endangerment enhancement. Usually those cases, though, are people who are on foot? No, the court has said that it's actually got a case that holds that the mere fact that the defendant fled from police in a car was not enough. I cited that in my briefs. Let's see. That case... Let's see. I don't have that among the ones that I've listed, but it's a case that cites Conley, which is the court's primary case that says that, and it's cited in my briefs. So, the problem with the spike strips primarily is that there was no showing that he was aware of them, and you can't assume knowledge of police tactics. But, there's also the additional problem that spike strips don't, in fact, pose a risk of a blowout, like you're talking about. That's just not the way that they work. Well, you said that in your brief. Was there any evidence presented in the appellate record that spike strips are not dangerous? There's not, and that's another reason why the government loses. It's the government's burden to prove the substantial risk. And, no, the government didn't present any evidence about how the spike strips works, and that's why it loses. Well, I was actually asking about your factual representation in your appellate brief. Oh, I think that those are legislative facts and not adjudicative facts, and that the court can take judicial notice of that. Well, if it's a legislative fact, that could cut both ways, can't it? In other words, if it's a legislative fact that we can judicially notice that spike strips are not dangerous, then there's no logical reason that we can't judicially notice that spike strips are dangerous, particularly when there are cases, applying the reckless endangerment exception or enhancement, that specifically say that spike strips are dangerous. I haven't seen those cases. Well, that's a question. Your acknowledgment of legislative fact could cut either way. I think that the court could judicially notice what spike strips do. However, the court can't judicially notice what Mr. Young was aware of. So that's the core problem with the spike strips issue, is you can't assume knowledge of police tactics. And the government, I pointed that out in my opening brief, the government doesn't even address it in its brief. The district court didn't address it. The government didn't address it. What standard of review is appropriate in this case? The standard of review is de novo, because we are not challenging the district court's findings of fact. We're contesting whether the facts that the district court found support the enhancement as a matter of law. Well, how does that square with our Brown case? Because in Brown and in Conley and these other cases, the defendant did not ask the court to determine whether the facts found by the district court supported the enhancement as a matter of law. And that's what this court has done in all manner of different guidelines cases, in vulnerable victims cases, obstruction of justice cases, position of trust cases. Whenever the defendant says these facts, we're admitting them. They don't support the enhancement as a matter of law. Did you ask for a hearing on that issue? Did we ask for a hearing? No, because the facts weren't contested. We agreed with all the facts. And that just goes to show why this is. I'm sorry. You say they were not contested? The district court's findings of facts, the facts in the PSR, were not contested. All that was contested was the district court's legal conclusion that those facts meet the test for the reckless endangerment enhancement. So when you concede, and you repeated it just now, that you are not questioning any of the district judge's findings of fact, that would include the finding in volume three, page 47, where the district judge specifically found that the deployment of spike strips put at risk the general public as well as others. You're accepting you are not questioning that finding? I think that that is not a factual finding. I think it's an assertion of, it's a legal conclusion. It's an assertion that the facts meet the test. If it's a legal, if it's a fact and not a legal conclusion, where are you? If it's a, if what Justice Baccarat just spoke of is a fact, then we are contesting that. And the district court's decision would be clearly erroneous, because there was no evidence in the record. Well, if you didn't, if you didn't ask for a hearing, you don't have, there's nothing to contest. I do, because it's the government's burden. Well, you say that it's a legal issue, but if it's not a legal issue, and you did not contest that finding, that finding's solid. No, because we did object to the reckless endangerment enhancement. Did you ask for a hearing? It's not my burden to, it's the government's burden to. If there's a contested issue in a pre-sentence report, you can ask, you have to ask for a hearing. What we have to do is to object to the enhancement. When we object to the enhancement, it becomes incumbent on the government to prove it. There were no findings, there were no facts in the PSR to suggest that there were other bystanders, that there were other cars present. And so we objected to the PSR, then it became incumbent on the government to prove the facts. Another reason that. Is it undisputed that this slow chase, we'll call it, occurred on an interstate? I think that it is. I-90? On I-90, yeah. And that's a fact, that's a fact, undisputed? That's a fact that's undisputed. And there are several reasons why we can't just, in the absence of any evidence, we can't just assume that there were other cars around. One of them is that defense counsel, who had seen all the discovery in this matter, represented to the court that there was nobody else around. The prosecution, when it was arguing for the enhancement. How would he know that? How what? How would he know that? He would have reviewed the discovery. And he was out on I-90 at 6.30 in the morning? No, but he had reviewed the discovery of police officers who were out on I-90. And what did they say? What's that? What did they say? The discovery is not in the record. I can tell you what they said. Well, if it's not in the record, you can't disclose it. Right. But what I can say is in the record is that defense counsel represented to the court that there was no one there. The prosecutor then had a chance to make his argument for it and never disputed that there was nobody else there. Also, this is not some residential or commercial area. This is a highway in Wyoming. Where did this begin? Did it begin in the city of Gillette? All of the areas are technically within the territorial jurisdiction of Gillette. But none of it, so far as the record reveals, none of it occurred in a residential area. They talk about he was initially spotted in a parking lot two blocks away from the girlfriend's house. All the parking lots two blocks away from the girlfriend's house are along the highway. And also, we don't know exactly when the chase started. All we know is that at least part of it occurred on I-90. Maybe all of it occurred on I-90. But as far, we just, there's nothing in the record to suggest that it occurred through a residential or commercial area. Well, why shouldn't we consider the four and a half hour standoff in our analysis under 3C1.2? Well, that goes back to my argument that a verbal threat is not enough. Oh, we had more than a verbal threat. I mean, he had his gun there. Everybody knew it. He called the dispatcher and he tied up the whole area for four and a half hours. Well, the problem is that there's... They just wave everybody around it, put cones around them? The problem is that there's no evidence that he even handled the gun, much less brandished it. For all the record shows, the gun may have stayed in the glove box the whole time. Well, let's say you're right. Let's say it stayed in the glove box the whole time. And let's say, hypothetically, that we can't take the verbal threat against the officers as evidence that the officers were under threat. Wouldn't the verbal threat, particularly during this four and a half hour standoff, create the danger that the officers would shoot at him? Absolutely. Absolutely. And if there was a threat that they would shoot at him, wasn't there a reasonable apprehension that somebody else, for example, another officer, might accidentally get shot? No, I don't think so, because there have to be other bystanders that are around the defendant. Well, there's other officers that are around. No, there's nothing in the record to show where they're stationed. So there's nothing in the record to suggest that the officers would be shooting in the direction of other officers. And that distinguishes one of the cases that I talk about in the brief, the service station case. There were other bystanders who were in the immediate vicinity of the defendant who was engaged in the standoff. We don't have anything like that here. The government put on no evidence, and the district court made no findings about whether any officers were stationed in that area. So if there are no further questions, I'll reserve three minutes for rebuttal. Thank you. May it please the court. My name is Jason Conrad. I'm an assistant United States attorney out of the Lander branch office up in Wyoming. Your Honor, the United States is not arguing that every threat creates a substantial risk of death or serious bodily injury. What the government is arguing is that the threats in this case did do so.  He's armed, he's armed. Suicidal felon threatening to shoot the police and himself during a chase and a subsequent four-hour standoff. This fits the dictionary definition of the substantial risk of death or serious bodily injury. First, this case did not occur in a vacuum. The defendant's actions and his deeds that day occurred in real time and in real life on the streets. It created a danger to the police, the public, as well as the defendant, even though that doesn't count under the enhancement. Here's what we have, Your Honor. The defendant was suicidal. He was armed with a .45 caliber pistol and he was headed to kill himself in front of his girlfriend to teach her a lesson. The police intercept him two blocks from the girlfriend's house. They try to stop him. He won't. The chase is on. Now, it's not a high-speed chase. Granted, it's a medium-speed to slow-speed chase, but it's a chase. He's not stopping. He's been told to stop and he's not stopping. Now, the exact duration of the chase is unknown. It could be 41 minutes, it could be 30, but it was long enough that the police were able to coordinate and put up spike strips. So it took a little while. Additionally, we don't know the exact route of this chase, but we know he was seen in the city of Gillette. As the defendant points out, he was two miles from his girlfriend's house on the interstate, so he went somewhere. Whether he went back and forth on the interstate or through town, we don't know the exact route. But we do know is that during the pursuit, the defendant got on his phone while he was driving, called the police, talked to Corporal Johnson, and he said, hey, get these guys off my tail or I'm going to kill myself. If you guys try to do anything, I'll shoot you. I have hollow-point bullets and I know you wear bullet-proof vests and I'm a good shot. So these are the facts. This is not just a verbal threat. This is not a defendant sitting on his couch making tough talk about what he's going to do to the police. Did the district court make any findings that those threats during the slow-speed chase created reckless endangerment? The district court did. Basically, what the district court did is said the totality of facts and circumstances, that this defendant failed to stop. During this time, he had a gun. He was making threats to himself and others. And that he had a spike-stripped, four-and-a-half-hour standoff threatening everybody. And so that was essentially the generic finding by the district court. Now, granted, it is not a specific finding. Judge Skavdal did not go through and make a two-page litany of all the things. And I don't blame him because it's common sense that the defendant, when he's driving on the freeway interstate, I mean, granted, it's Wyoming. It's not downtown Denver. But he's driving through the city of Gillette on the freeway, threatening to shoot the police with a .45-caliber pistol. An ensuing gunfight on the interstate puts everybody at risk. The other police officers, we don't need to show how bad of shots they are, how good of shots they are. There's ricochets. This court has held, and other courts have held, that when somebody drops a firearm, it may go off. So if somebody dropped, merely dropping a firearm, and it might go off and hit somebody, then certainly threatening to shoot somebody, causing the police to shoot back. But in the dropping of the weapon cases, there's actually been a dropping of the weapon, right? Here he threw ammo or the ammunition out, right, not the gun that was loaded? In this case, the defendant finally dropped his magazine out.  After the end of the four-and-a-half-hour standoff, he dropped the magazine out of the pistol. And the cases that we've had about throwing a weapon out, that is the gun itself, not just the magazine. In this case, Your Honor, the facts were that he did not drop the magazine out and essentially make the firearm safe, or what the officers hoped to make safe, until the end of the four-and-a-half-hour standoff. Right, right, right. We talk about a slow chase. Sixty miles an hour is not slow, is it? Well, I would argue no, Your Honor, when you're supposed to be pulling. It's a mile a minute. Exactly, Your Honor. When you're on the interstate and you're doing 40 to 60 miles an hour, and with regard to the spike strips, first of all, to the knowledge, this court has said, and all the courts have said, the recklessness element is knowledge of a reasonable person, not a reasonable criminal. So a reasonable person would think or should know that after about half an hour, 40 minutes, police chasing you down, they're going to stop you somehow. Whether it's a pit maneuver or spike strips, it's not a shock when all of a sudden on the freeway you hear a ba-dum-bum, and your tires start to lose air. Again, the defendant still didn't stop. He only stopped when the tire spikes took their intended purpose, they took effect. It was two miles past where he crossed him, wasn't it? That is correct, Your Honor. So in this case, I would jump around a little bit, and I apologize, but looking to the standard of review, the United States would say it's clear error, and that is because the defendant's argument is not accepting the district court's facts. In the cases written by this court, the standard is clear error, and you give reasonable inferences to the facts and alight most favorable to the ruling of the district court. Well, that's what we have here. We have a common-sense situation. We have facts that have reasonable inferences. There's a defendant who is armed, driving on the interstate, threatening to shoot police and himself. The first one is, by threatening to shoot yourself while you're driving on the interstate, creates a huge threat to the public, the motoring public, and the police following. If you shoot yourself while you're driving, you send a car joyriding down the interstate. Unless you have a Tesla. Exactly, Your Honor. The defendant makes a point of, well, there's no evidence that the defendant said he was actually going to shoot himself while he was driving. That's true. But it's a reasonable inference. This defendant was going to shoot himself in front of his girlfriend to teach her a lesson. He's intercepted by police. He's driving. He picks up his cell phone. He calls the police and says, hey, get off my tail. I'll shoot myself and I'll shoot these police. Then he gets on the phone and calls his best buddy, the one who started all this, thank goodness, and called the police and said it turned him in. So the defendant, driving on the freeway, calls the police, calls his best friend, and chastises him for calling the police. So it's reasonable to infer that he's just threatened to shoot himself. He has a gun. He's driving. He may just do it while he's driving. That creates a substantial risk to the motoring public. It's true, he could have pulled over. He could have drove back and killed himself in front of the girlfriend, too. But that's how that's a danger. And I think this court can take judicial notice that a driverless car on the interstate, whether it's 40, 60, is a danger to the public. Next, the threatening to shoot the police officers. This is not just a verbal threat. He was armed and dangerous. With a deadly weapon in his car, he threatened to shoot police. The defendant's quite lucky, in my view, that he didn't get a four-level bump for committing another felony offense during the commission of this offense, and that is threatening to use a drawn deadly weapon in violation of Wyoming Statute 62502A3. Under the Wyoming case law, the weapon doesn't need to be in your hand. It doesn't need to be drawn. It has to be available, ready for use, and has to be as part of the threat. I discovered all this in the Johnson morass, but this case, we clearly have that. The defendant had the firearm in the car. He threatened to shoot the police officers. That's threatening to use a drawn deadly weapon. Next, the public was put at risk. The defendant started in the city of Gillette. Whether it's on the interstate or through the town, it doesn't matter. If the gunfight ensues on the interstate that traverses through the city of Gillette, not only are those other folks on the interstate, both lanes, east and westbound, put at risk by stray bullets from a gunfight, but so are those people who are just off the interstate. The interstate runs right through town. So fine, maybe it's not a residential area, but the people at McDonald's who are going to work and going to get their coffee, they just have to suffer getting shot at because it's not a residential area. That seems silly. Everybody around is put at risk. But his argument, as I understand it, is that the district court's findings are insufficient to support the enhancement. And I question whether Judge Skavdal made any findings along the lines of what you're talking about. Whether there's any bystanders or whether there's any fast food restaurants in the vicinity. Yes, Your Honor. Judge Skavdal did not make that specific finding. I would answer that two ways. First, Judge Skavdal did not need to be that specific. It's a reasonable inference that an interstate through the city of Gillette, people are put at risk by stray bullets in a gunfight. This court has said as much in the Kirkhart case and the Porter case. When this court said, look, you don't have to show who is standing on the street corner, who is out driving, that the conduct of the defendant just needs to create a substantial risk of death or serious bodily injury. We don't have to identify all those out on the street or there were 10 people driving or five or two. Additionally, with regard to McDonald's and where it was, I'm relying on the map provided by the defendant talking about the challenge to the government saying, quote, that the chase went through town. And I'll admit, the chase probably, it did go through town. I don't know where. But his map, which he points out this court can take judicial knowledge of, shows where it started, shows where the mile marker is, shows a McDonald's within rifle range or pistol range. But I think Judge Skavdal's findings are, they're common sense. Those are the dictionary definition of reasonable inferences. That a gunfight ensues on an interstate running through a city, whether it's Podunk, Wyoming or not, people are put at risk. Additionally, other officers are placed at risk. They could be shot, ricocheting bullets, bouncing off the car. They don't know where they're intended. And once they hit the intended target, they may go elsewhere. I've mentioned before that spike strips, they create a risk. In this situation, we had an armed, suicidal defendant fleeing, failing to stop. Who knows what he's going to do? Well, the defendant is arguing here that he had no knowledge that the police were going to put down the spike strips. And so he's saying we can't blame the defendant for what the police are doing. Your Honor, and there are cases that say, and I believe it's, I can't remember the case, but it was immigration officials chasing the Jamaican guy out the window and they tackled him and broke their thumb. That is correct. That's instinctive flight. First, this is not instinctive flight. It's a 30-odd minute chase. The standard is a reasonable person, not a reasonable criminal. I have no doubt that this defendant in his state, suicidal, angry at his girlfriend, angry at himself, chastising his friend, he probably didn't put two and two together and think the police were stopping him. Looking at the PSR, he was arrogant enough. He probably thought he was getting away with it. But a reasonable person, which is the standard, would think, golly gee, after a half an hour being chased by the cops, they're going to stop me. They're going to shoot me. They're going to crash into me or they're going to lay out some spike strips. So I don't think a defendant needs to know how the police are going to stop them. They just need to know the police are going to stop them. The fourth argument I would make is that the four and a half hour standoff did create a substantial risk of death or serious bodily injury because the guidelines provide it's the act of resisting. It's to be taken into account the beginning, the middle, the end. Sure, there was no, quote, fleeing. He was stopped. He wasn't going anywhere.  grab him by the scruff of the neck and cuff him was because he had a gun and he was threatening to shoot them. Four hours later, they finally talk him into it. In that intervening four hours on the interstate and all around it, there's a threat to everybody of an ensuing gunfight. And that's a substantial risk of death or serious bodily injury. Additionally, Your Honor, looking at the cases from this court, this court has often said this is a Brown case that Judge Kelly, you authored. When that defendant was chasing, running from police, he drops the firearm by the water hole. The school kids say, hey, Mr. Officer, there's the gun. And this court said, the risk is, the danger is not just dropping the gun, it's those little kids might pick it up. In other cases, the courts have said if you throw the gun out and it might go off. There was the Hampton case where a guy was on a bicycle trying to break into a house, has a gun, police are behind him. He just throws the gun into the guy trying to keep him out. And he said, well, there's no risk there, I was giving him the gun, heck. And this court logically said, no way, you have a gun in your hand, you're trying to break into a house, it might go off. And when the cops see you pull that gun from your waistband, as Judge Bacharach said, in all those circumstances, in all those cases where people drive crazy, too fast for conditions, swerving, bobbing, weaving, if those count as reckless endangerment during flight, then most certainly, a suicidal armed defendant threatening to shoot police while he's on the interstate qualifies as well. My final point would be we talked about cases where the spike strips for a passenger, an enhancement was upheld for that passenger. In that case, spike strips were used. And in that case, the reckless endangerment was merely throwing papers out the window and driving a little crazy. And that was the passenger. In Connolly, it was the passenger. So if a passenger can be held liable for the crazy driving of the defendant because it's foreseeable in that kind of a case, then certainly an armed suicidal felon running from the police for 30 minutes and threatening to shoot them counts. Thank you. Thank you. Your Honors, what the guideline requires is a substantial risk. And this Court has said that substantial risk means high probability. What the government is doing here is just piling inference upon inference upon inference in a way that can't amount to a high probability. So yes, there was a risk that the police may have shot at Mr. Young. But what the government is saying is, well, there was a risk that the police might have shot at Mr. Young. And if they had shot at Mr. Young, the bullets may have misfired. And if the bullets may have misfired, the bullets may have hit a pedestrian who may have been there. And that does not constitute a high probability. That constitutes piling inference upon inference upon inference. And this Court should not affirm for that reason. If there are no other questions, I'll... I do have one. And it pertains to the standard. Now, you're arguing that the findings are, as I understand it, the findings are insufficient to support the enhancement. Now, typically, when someone challenges the sufficiency of findings, the matter is, in substance, whether or not the explanation for the judicial determination is sufficient. And so, I don't read your argument to being that the findings are insufficient in that sense. In other words, that in another case, or even in this case, that Judge Skavdal needed to make a more elaborate explanation for why he was invoking the enhancement. And if that... So, that's part one of my question. And if the answer to that is that I'm right in your interpretation of what you're arguing and what you're not arguing, I'm wondering how we can apply de novo review. Because the explanation was better than most. So, you're not challenging the sufficiency of... See, what you seem to be saying is that I'm challenging the sufficiency of the findings because the judge didn't go point by point by point and address every one of my arguments about these individual components of risk. No, I'm not challenging the elaborateness of the explanation. What I'm challenging is that the facts set forth in the PSR and the facts found by the district court. So, you can look at all of the facts that are set forth in the PSR, regardless of whether the findings don't meet the legal standard. And from what you just said, then we can also consider the evidence in the PSR in the light most favorable to the government to determine whether or not the enhancement is supported. No, you don't use the PSR as evidence in the light most favorable to the government. The district court adopted the PSR, so the PSR and the PSR are the district court's findings. They're not sufficient as a matter of law to show that the enhancement applies. Okay. Thank you. Thank you both for your arguments. This case is submitted.